## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THYRA LOWE**, | ) |
| | ) |
| Plaintiff; | ) |
| | ) |
| v. | ) |
| | ) |
| **DISTRICT OF COLUMBIA**, | ) |
| A Municipal Corporation, | ) |
| | ) |
| **GREGORY PAYNE**, | ) Civil Action No. 05-2205 (HHK) |
| In his official and individual capacities, | ) (Jury Trial Requested) |
| | ) |
| **MONICA LAMBOY**, | ) |
| In her official and individual capacities, | ) |
| | ) |
| **THOMAS CALHOUN** | ) |
| In his official and individual capacities, | ) |
| | ) |
| and | ) |
| | ) |
| **CHERYL EDWARDS**, | ) |
| In her official and individual capacities, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### AMENDED COMPLAINT FOR UNLAWFUL EMPLOYMENT RETALIATION

### INTRODUCTORY STATEMENT

Plaintiff Thyra Lowe, by and through undersigned counsel, complains for money damages and other relief for violations under the First Amendment to the Constitution of the United States, actionable under 42 U.S.C. Sec. 1983, and for violations of the District of Columbia Whistleblower Reinforcement Act, D.C. Official Code Sec. 1-615.51 *et seq.*, by defendants.

Ms. Lowe was unlawfully terminated when her position was "abolished" by her employer, the District of Columbia Department of Health (DOH), in retaliation for speaking out against violations of District of Columbia and federal regulations and laws, and for other protected activity disclosing waste, fraud, abuse, and gross mismanagement.

Ms. Lowe seeks reinstatement, back pay, and restoration of benefits from the DOH and, in their official and individual capacities, from departmental managers and officials who took the illegal actions against her, she also seeks compensatory damages, attorney fees, and all other damages available and appropriate.

## I. PARTIES

1.  Plaintiff Thyra Lowe is a resident of the District of Columbia and a citizen of the United States.

2.  Defendant District of Columbia (D.C.) is a political subdivision of the Untied States of America.  At all times material to this complaint, Defendant D.C. acted through its agents, the senior managers at the DOH who approved, ratified and adopted all acts and omissions against Plaintiff.

3.  Defendant Gregory Payne is or was the Director of Health at the DOH, and as such approved, ratified and adopted all acts and omissions against Plaintiff and is sued in his official and individual capacities.

4.  Defendant Thomas Calhoun is or was the Administrator of the Emergency Health Management System Administration (EHMSA) in the DOH, and as such approved, ratified and adopted all acts and omissions against Plaintiff, and is sued in his official and individual capacities.

5.  Defendant Monica Lamboy is or was the Chief Operating Officer of EHMSA and as such approved, ratified and adopted all acts and omissions against Plaintiff, and is sued in her official and individual capacities.

6.  Defendant Cheryl Edwards is or was the Interim Chief of Staff of EHMSA and as such approved, ratified and adopted all acts and omissions against Plaintiff, and is sued in her official and individual capacities.

## II.  GENERAL AVERMENTS OF FACT

7.  Plaintiff Thyra Lowe holds a B.A. in Urban Planning and an M.A. in Community and Regional Planning.  She was the Deputy Administrator (Management Supervisory Service-14) of EHMSA between November, 2002, and November, 2004.  While serving as such, her salary was paid from federal grants awarded to the DOH.

8.  When Ms. Lowe began working for EHMSA, Sherry Adams was the Administrator of the agency.  Dr. Michael Richardson, then the DOH Senior Deputy Director for Medical Affairs, upon information and belief, was at the time unhappy with Ms. Adams's performance as Administrator.  He interviewed Ms. Lowe for two positions at EHMSA: Deputy Administrator–the position which Ms. Lowe was eventually offered and which she accepted; and

Administrator–the position then held by Ms. Adams.

9.  Shortly after Ms. Lowe began work as the Deputy Director of EHMSA, she forged a good working relationship with Ms. Adams.  Ms. Lowe gained respect for Ms. Adams's abilities and work ethic, and eventually came to the conclusion that Dr. Richardson was misguided in his view that Ms. Adams's performance as Administrator was sub-par.

10.  On March 7, 2003, Dr. Richardson removed Ms. Adams from her duties as Administrator.  Though she was not terminated and her salary remained the same, she was demoted to a lesser position that did not carry with it the power to make decisions contrary to Dr. Richardson's agenda for EHMSA.  Upon information and belief, It was Dr. Richardson's hope, at the time, that once Ms. Adams had been "shelved," she would resign.

11.  Dr. Richardson did not contemporaneously appoint an Acting Administrator.  Rather, pending the appointment of Dr. Feesah Woldu, who was eventually hired to fill the Acting Administrator position, the duties of Acting Administrator fell to Ms. Lowe, who, as Deputy Administrator, was next in the chain of command at EHMSA.

12.  Because Ms. Lowe felt that Dr. Richardson's decision to remove Ms. Adams from the position of Administrator was in error, on or about March 10, 2003, she wrote a memorandum to the DOH Director, Dr. Buford, explaining why she believed Ms. Adams should be reinstated to her former position.

-4-

13. Shortly after Ms. Adams was demoted, Dr. Richardson expected her to, and Ms. Lowe began to take on the additional duties of Acting Administrator, although her title did not change. Apart from Ms. Lowe's belief that it was wrong to remove Ms. Adams, at the time, she felt she had a reasonable opportunity to be promoted to the Administrator position since Dr. Richardson interviewed her for the position of Administrator before hiring her as the Deputy Administrator.

14. During the time that Ms. Lowe served as *de facto* Acting Administrator, she was given complete responsibility for the administration, staff, and funding of grants for EHMSA. She led the agency's operational response to Hurricane Isabel, the Ballou High School mercury spill, the Bethesda Naval Center anthrax scare, the ricin scare on Capitol Hill, and the lead in the water emergency. Under her direction, EHMSA conceived and developed the Emergency Healthcare Reserve Corps, the only comprehensive healthcare corps in the nation. Under Ms. Lowe's guidance and supervision, EHMSA completed spending $20 million in U.S. Department of Defense Emergency Preparedness Funds, wrote four (4) federal bioterrorism preparedness grants, and met the goals for two previously awarded grants.

15. On or around the time that Ms. Lowe took on these additional duties of EHMSA Administrator she found herself opposed to some of Dr. Richardson's actions at EHMSA, specifically including his decisions to spend Department of Defense grant dollars in ways that were illegal under the terms of the grant.

16. At some point between November, 2002, and February, 2003, Dr. Richardson

proposed to award former D.C. Mayor Sharon Pratt-Kelly, now a private contractor, a $250,000.00 contract to produce a report on the readiness of the District to respond to a bio-terrorist attack.

17.  Ms. Lowe felt that former Mayor Pratt-Kelly, who has no training or expertise in the field of public health, was unqualified and ill-equipped to produce such a report, and, accordingly, spoke against the proposal as a waste of funds, gross mismanagement,  and out of concern for the public health and safety.

18.  Ms. Lowe also opposed the proposal because it violated the terms of the federal grant from the Department of Defense, which mandated that the monies with which Dr. Richardson proposed to pay former Mayor Sharon Pratt-Kelly be used to purchase goods and services for a public health emergency.  Ms. Lowe knew that the type of contract that Dr. Richardson intended to award to the former mayor was outside the scope of the grant, and she communicated this to Dr. Richardson in a one-on-one conversation.

19.  Ms. Lowe concluded that Dr. Richardson wanted to award the contract to former Mayor Sharon Pratt-Kelly to further his political ambitions, and, concerned for the public good and the public interest, she voiced her strong opposition to such grant spending in a second conversation with Dr. Richardson.  Ms. Adams was present at one of Ms. Lowe's conversations with Dr. Richardson about the proposed contract, which occurred just before Ms. Adams was demoted.

20.    Despite Ms. Lowe's internal protests, the contract was awarded to the former Mayor. After Ms. Lowe spoke out against the contract, Dr. Richardson treated her as an insubordinate employee; he acted like he was displeased with her.  Ms. Lowe also believed  that Dr. Richardson was retaliating against her because of her opposition to Ms. Adams's demotion. Upon information and belief, Dr. Richardson accelerated Dr. Waldu's placement as the Acting Administrator in order to suppress Ms. Lowe's dissent within EHMSA and DOH.

21.    Shortly after Dr. Woldu commenced his tenure as the Acting Administrator of EHMSA in Spring, 2003, it became apparent that he was not competent to perform all of the duties of that position.  Dr. Woldu had little or no experience in applying for grant monies on behalf of a government agency, and he was not capable of implementing effective strategies for properly spending the grant monies that EHMSA had already secured.  In fact, Dr. Woldu implicitly recognized this himself when he charged Ms. Lowe with the continued duties of grant writing and implementation (neither of which were duties in the official position description for the Deputy Administrator).

22.    Rather than resign, Ms. Adams instead sued the DOH in federal court, alleging that Director James Buford and Dr. Richardson violated her rights under the First Amendment, District of Columbia Whistleblower Reinstatement Act and Title VII.  Her lawsuit resulted in a settlement, the terms of which awarded her a promotion to the position of Assistant Senior Deputy Director.

23.    At the request of Ms. Adams's counsel of record in her suit against the DOH, Ms.

Lowe produced two signed declarations, dated May 9, 2003, and May 29, 2003, in support of Ms. Adams's claims that she had been wrongfully removed from her duties as Administrator. Ms. Lowe's affidavits included statements that indicated that the contract awarded former Mayor Sharon Pratt-Kelly was illegal. Her affidavit also stated that she believed that Ms. Adams had been fired because of her gender and because Dr. Richardson wanted to replace Ms. Adams with a man. Her affidavit further stated that Ms. Adams was competent to perform the duties of Administrator and that, for that reason alone, Dr. Richardson was wrong to remove her from that position.

24. In or around June, 2003, Ms. Lowe learned that Dr. Richardson and Dr. Woldu were planning to move some or all of the following DOH staff members onto the payroll funded by the federal bioterrorism grants she oversaw: Deirdre Jordan, Interim Administrative Officer; Corey Palmer, Staff Assistant; Ava Green Davenport, Senior Health Policy Advisor; and Clarence Minor, Driver; specifically, Dr. Richardson and Dr. Woldu directed that the aforementioned employees be paid out of grant monies awarded by the federal Center for Disease Control (CDC). Ms. Lowe explained to Dr. Richardson and Dr. Woldu that this action would violate the Public Health Service Act prohibition against using federal bioterrorism grant funds to supplant state and local funds, 42 U.S.C.A. Sec. 247d-6 (j).

25. Upon information and belief, Dr. Richardson and Dr. Woldu were displeased by Ms. Lowe's unwillingness to accede to their unlawful plan to change the payroll. Because of mismanagement of the overall DOH budget, these managers were under pressure to reduce DOH costs paid by District of Columbia funds by putting "direct payees," or EHMSA employees who

-8-

were legally required to be paid directly by the District, onto the federal grant payroll.  In

violation of federal law and despite Ms. Lowe's communications that the proposal was illegal,

some or all of the aforementioned EHRSA employees, including Ms. Davenport, were paid out

of the CDC grant.


26.  Ms. Lowe contacted the Center for Disease Control, whose officials immediately

directed Dr. Richardson and Dr. Woldu or other management staff at the DOH to remove Minor

and Palmer from the grant payroll.  In defiance of CDC's directives, these individuals remained

on the grant at least until the day Ms. Lowe left EHMSA.


27.  At some point after Dr. Woldu was named Acting Administrator, Dr. Richardson

hired Dr. Thomas Calhoun.  Dr. Calhoun was Ms. Lowe's subordinate at EHMSA, but the two

initially enjoyed a collegial relationship.  Ms. Lowe believed that she could trust Dr. Calhoun,

and she would, at times, voice her concerns to Dr. Calhoun about the policies of EHMSA under

the direction of Dr. Richardson; in particular, she confided in him her concerns about the use of

certain grant monies awarded to EHMSA.  Ms. Lowe did not know, at the time, that Dr. Calhoun

was once Dr. Richardson's mentor in the private sector, and that Dr. Calhoun had been one of

Dr. Richardson's professors.


28.  On February 26, 2004, the City Administrator appointed Dr. Calhoun the Acting

Administrator of EHMSA (replacing Dr. Woldu), and making him the second unqualified person

appointed to the position in the stead of Ms. Lowe.

29.  In March, 2004, DOH settled Ms. Adams' case, paid her attorney's fees, and returned her to her duties with a promotion to EHMSA Assistant Senior Deputy Director.

30.  On or around February, 2004, Mr. Buford was replaced by Herb Tillery as Interim Director of Health.

31.  Throughout her tenure at EHMSA, Ms. Lowe was the program manager and bioterrorism coordinator for federal funds paid to the District under cooperative agreement grants between EHMSA, the federal CDC and the federal Health Resources Services Administration (HRSA).  Cooperative agreement grants require the grantor (CDC or HRSA) to work with the grantee (EHMSA); the grantor provides prescriptive guidance with objective standards, and the state/local agency writes the grant proposal, following the federal guidance, to adapt it for the needs of the particular state/city.  It is a violation of federal laws and regulations to spend funds outside of those guidelines without an explicit waiver from the grantor; the state or local agency receiving the funds is also required to convene, work with, and disperse funds to various "stakeholder" entities such as health care providers, contractors, and other local and regional governments.

32.  Upon information and belief, Dr. Calhoun immediately began an effort to convince Mr. Tillery that Ms. Lowe was a problem for the agency because she would not acquiesce in former and current managerial decisions to misuse grant monies.  Ms. Lowe was told by other DOH employees that Dr. Calhoun held a personal and professional vendetta against her for not capitulating in Dr. Richardson's illegal attempts to spend DOH grant funds.

33.  During Ms. Lowe's tenure as Deputy Administrator, the District of Columbia Hospital Association (DCHA) continually pressed DOH for a larger share of money from the HRSA and CDC grants that Ms. Lowe managed.  DCHA tried to persuade EHMSA to divert funds to uses not approved by the granting agencies.  EHMSA officials, other than Ms. Lowe, were compliant.  On a consistent basis, beginning from the time that DCHA began its campaign to attain grant monies for purposed impermissible under grant directives, Ms. Lowe communicated to EHMSA management her opposition to such misuse of EHMSA grant funds.

34.  During the months that followed Ms. Adams's settlement, Dr. Calhoun and Dr. Dan Lucey, Chief Medical Officer at DOH, continued attempts to have Ms. Lowe's employment terminated because of her unwillingness to acquiesce in the agency's policy to violate laws and regulations governing disbursement of grant monies; Drs. Calhoun and Lucey deliberately and significantly damaged Ms. Lowe's reputation with other administrators, including Ms. Cheryl Edwards, Chief of Staff, and Ms. Monica Lamboy, Chief Operating Officer.

35.  In or around late June, 2004, the President of DCHA, Bob Malson, pressured Interim Director of Health Herb Tillery, Chief of Staff Cheryl Edwards, Administrator Dr. Calhoun, and Ms. Lowe to provide grant funds for the entire $250,000.00 annual salary of the DCHA Medical Director, Jeffrey Elting, M.D.

36.  Ms. Lowe consulted HRSA for guidance.  By electronic mail on or around June 25, 2004, and on or around June 29, 2004, HRSA instructed Ms. Lowe that such funding for the

DCHA medical director's salary was improper.

37.  Upon information and belief, Dr. Calhoun and/or Ron Lewis (who had replaced Mr. Tillery as Interim Director of Health) nonetheless promised Bob Melson the $250,000.00 he sought from the HRSA grant through EHMSA.

38.  On June 30, 2004, shortly before grant applications to HRSA and CDC were due, Ms. Lowe was abruptly summoned to a meeting with Mr. Tillery, Ms. Edwards, and Mr. Malson. Ms. Lowe was interrogated about why the entire $250,000.00 had not been allocated to DCHA. She explained that she had received a ruling from HRSA that disallowed the allocation, and that payment of DCHA staff would count toward the administrative cap on the grant funds (EHMSA was already at the administrative cap for personnel); she further explained that this use of grant funds would also raise conflict-of-interest concerns.  Mr. Tillery and Ms. Edwards were not satisfied with her response, and an HRSA grant official was called during the meeting (with all parties present).  The grant official confirmed what Ms. Lowe had told Mr. Tillery and Ms. Edwards.

39.  After the June 30, 2004, meeting, the President of DCHA asserted that as a member of a DOH sponsored Bioterrorism Committee, DCHA had veto power over DOH grant fund allocation.  By vetoing certain expenditures, DCHA proposed to make more money available for its own use.

40. Ms. Lowe objected to her supervisors' willingness to try to accommodate DCHA as an abuse of authority and violation of grant regulations and rules. She communicated her views to her supervisors at DOH, but was ignored.

41. Ms. Lowe then contacted employees at the CDC and HRSA directly for oral and/or written decisions on DCHA's proposed uses of grant monies. Officials from both the CDC and HRSA gave oral and/or written determinations that the proposed uses of grant monies violated grant provisions and were illegal.

42. On September 17, 2004, the Director of the District of Columbia Office of Boards and Commissions made a written determination that the Bioterrorism Committee was "purely advisory" and "does not currently have, nor was it intended to have the authority to review, veto, approve, or contravene final grants submissions of the District government to whatever source," demonstrating that Ms. Lowe was correct in her objections to DCHA's plan to veto DOH allocations involving federal grant funds.

43. In late September, 2004, Monica Lamboy, the DOH Chief Operating Officer, proposed to violate the Public Health Service Act prohibition against using federal bioterrorism funds to supplant state and local funds, 42 U.S.C.A. § 247d-6 (j). Ms. Lamboy proposed a reduction-in-force followed by movement of displaced staff from local funds to bioterrorism funds, even though these staff members' positions were not in support of bioterrorism preparedness. Upon information and belief, under Ms. Lamboy's scheme certain EHMSA jobs would be given new titles–though the duties associated with them would remain the same. Once

-13-

these jobs had been retitled, former direct-payees would be supplanted by federal grants salaries (the scheme being that new job titles would act as a smoke-screens for the fact that the employees had been illegally moved onto federal grant payrolls).

44.  Ms. Lowe opposed Ms. Lamboy's proposal, and communicated her opposition to Ms. Lamboy in approximately seven (7) separate e-mails.  Ms. Lamboy ignored Ms. Lowe's advice and subsequently kept several positions on the grant without approval from the CDC. This action was in violation of federal grant regulations and rules.

45.  Prompted by concern for the public good and the public interest, Ms. Lowe further communicated her opposition to Ms. Lamboy's actions to Ms. Adams, Dr. Calhoun, and Ms. Lamboy herself.

46.  In or around September, 2004, Ms. Lowe's time was occupied by the task of mounting a program on bioterrorism preparedness.  Many employees of federal and local agencies, as well as members of interested private organizations, participated in the forum.  After the program's conclusion, Ms. Lowe was commended by Greg Payne, Director of Health, and Dr. Calhoun, the agency's Administrator, for the quality of her work.

47.  Less than a month later, Ms. Lowe was abruptly informed of the abolishment of her position.  The abolishment notice was dated October 15, 2004, effective November 15, 2004. The notice letter stated that the removal came "as a result of the Department's restructuring."

Although the notice letter stated that Ms. Lowe might be eligible for severance pay, she has not received any to date.

48.  Upon information and belief, the reorganization of EHMSA was undertaken so that direct-payee EHMSA employees could be supplanted to federal grant salary positions–the very supplanting proposals that Ms. Lowe spoke out against.  EHMSA management utilized the reorganization as a vehicle to remove Ms. Lowe–whose performance record while employed at EHMSA was exemplary–by abolishing her position.  The action was taken in retaliation for protected disclosures she made out of concern for the public good and in opposition to illegal EHMSA proposals to misuse grant monies in the above instances, and in retaliation for the disclosures Ms. Lowe made in her affidavits in Ms. Adams's case.

49.  Upon information and belief, the restructuring of EHMSA to achieve the above outcome(s) was conceived and/or executed by Ron Lewis, former DOH Director of Health, Greg Payne, DOH Director of Health at the time of the reorganization, Monica Lamboy, and/or Cheryl Edwards.

50.  Upon information and belief, Ms. Lowe was the only EHMSA employee who was removed from the agency's payroll as a result of the restructuring.  (Dr. Calhoun was "removed" at the same time, but DOH reappointed him to a position in the Addiction Prevention and Recovery Administration (APRA)).

51.  DOH replaced Dr. Calhoun and Ms. Lowe with Roderick Blair and Andrew Brave, respectively.  Before assuming responsibility for public health emergencies in the nation's capital, Mr. Blair worked as a caterer and restauranteur in the District of Columbia at the Heart and Soul Café.  Neither Mr. Blair nor Mr. Brave had any job experience or education in EMS management, public health, public health emergency response, personnel management, bioterrorism preparedness, strategic planning, or grants management.  Neither met the requirements, as outlined in 2002, for Deputy Administrator, Bioterrorism Coordinator, Administrator, nor the Senior Deputy Director.  Mr. Brave has already left EHMSA.

52.  The day after DOH notified Ms. Lowe of her termination, DOH hired Dr. Elting as Medical Director for EHMSA, a position he held concurrent with his duties at DCHA.  These dual roles presented an obvious conflict of interest, which the CDC stated in a written objection to the hiring.  Dr. Elting has since left DOH and returned to DCHA.

53.  Based on the foregoing, Ms. Lowe spoke out concern for the public interest in: (1) the letter and/or memorandum that she wrote to Dr. Buford regarding Dr. Richardson's unwarranted decision to remove Ms. Adams from the Administrator position in 2002; (2) the communications she made to Dr. Richardson and or Ms. Adams in two conversations regarding Dr. Richardson's illegal plan to award former Mayor Sharon Pratt-Kelly a contract worth $250,000.00 in 2002 and/or 2003 to produce a report on the Districts readiness for a bioterror attack; (3) the declarations and/or affidavits that she executed for Ms. Adams's lawsuit against the DOH/EHMSA in 2003; (4) the communications she made to protest Dr. Richardson's and Dr. Woldu's unlawful plan to pay the salaries of Ms. Jordan, Mr. Palmer, Ms. Davenport and

Mr. Minor with funds from federal CDC grants mandated for other purposes in 2003; (5) the communications that she made to officials at the CDC regarding the same in 2003; (6) the communications that she made within DOH regarding Mr. Tillery's, Ms. Edwards's, Dr. Calhoun's, and Ms. Lamboy's improper plan to award the DCHA $250,000.00 to pay the salary of Dr. Elting in 2004; (7) the communications she made to officials at HRSA regarding the same in 2004; (8) communications she made to officials at the CDC and HRSA regarding the inappropriate use of grant monies by the DOH/EHMSA in 2004; and (9) communications she made within DOH regarding Ms. Lamboy's illegal proposal to reorganize EHMSA employees with the goal of moving them to federal grants in 2004, including, but not limited to the seven emails that she sent Ms. Lamboy regarding the unlawful purpose.

54.  At no point during Ms. Lowe's tenure at EHMSA did the DOH's interest in performing its mission efficiently outweigh Ms. Lowe's interest in speaking out of concern for the public good and the public interest on matters concerning illegal practices, mismanagement, and/or abuses of discretion by agency management.

55.  Each and every disclosure and/or declaration that Ms. Lowe made regarding the illegal practices of DOH/EHMSA management was prompted by a concern for the public good and public interest rather than by personal grievances.  None was prompted by animus towards Ms. Lowe's superiors or fellow employees.

56.  Upon information and belief, the DC DOH has or had a practice, and therefore a policy, of punishing employees who spoke out about waste, mismanagement, abuse of authority,

and illegalities, as is evidenced by the adverse personnel actions taken against Ms. Adams and Ms. Lowe.

### III. CLAIMS FOR RELIEF

#### COUNT I

#### Violations of the DC Whistleblower Reinforcement Act

57.  Plaintiff realleges paragraphs numbered 1-56 above.

58.  Under the D.C. Whistleblower Reinforcement Act (DCWRA), D.C. Official Code Sec. 1-615.52, an illegal order is a directive to violate or to assist in violating a federal, state, or local law, rule, or regulation, and a protected disclosure means any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences either gross mismanagement, gross misuse or waste of public resources or funds, abuse of authority in connection with the administration of a public program or the execution of a public contract, a violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature, or a substantial and specific danger to the public health and safety.

59.  Ms. Lowe refused to comply with several illegal orders within the meaning of the DCWRA, including but not limited to, orders to direct additional funds to DCHA and to use federal grant funds to supplant local funds, all of which violated federal laws and regulations. Ms. Lowe refused to follow those orders, and notified grant-issuing authorities, which are public

bodies under the statute.

60. Ms. Lowe's actions set forth in paragraphs 1-56 above constituted protected activities and disclosures within the meaning of the DCWRA.

61. Sec. 1-615.53 of the DCWRA prohibits personnel action and other retaliation against an employee because of the employee's protected disclosures or refusals to comply with illegal orders. Ms. Lowe's position at EHMSA was abolished as a pretext for wrongful and illegal retaliation for her protected disclosures and refusals to comply with illegal orders, and abolishment of her position was, therefore, in violation of the DCWRA.

COUNT II.

Deprivation of Constitutional and Civil Rights

62. Plaintiff realleges paragraphs 1-56 above.

63. In making the communications set forth in paragraphs 1-56 above, Ms. Lowe was speaking about matters of public concern, including matters pertaining to governmental mismanagement, waste, misuse of public monies, abuse of authority and discretion, and violations of laws and regulations; Ms. Lowe's interest and the public interest in her communications were not outweighed by EHMSA's interest in efficient performance of its mission, and all of Ms. Lowe's speech and communications were protected under the First Amendment to the Constitution of the United States.

64.  Ms. Lowe's position at EHMSA was abolished in retaliation for her constitutionally protected speech, and to prevent her from making any further such communications in the future, in violation of the First Amendment to the Constitution of the United States.

65.  Under 42 U.S.C. Sec. 1983, Ms. Lowe is entitled to a private right of action to recover damages and other relief against Defendant District of Columbia, and against the named Defendants in their individual and official capacities, for deprivation of First Amendment rights.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays that the following relief be granted for both Counts above:

1.  Reinstatement, with full back pay and benefits to the Chief of Staff position at the DOH/EHMSA;

2.  Compensatory damages for injury to the Plaintiff, including but not limited to injury to her professional reputation and standing, mental health and well being, physical health and well being, career and income potential and violations of her civil rights;

3.  An order directing the District of Columbia to take appropriate disciplinary action against District officials found to have violated D.C. Official Code Sec. 1-615.53, as provided in D.C. Official Code Sec. 1-615.55; and

4.  All other relief which law and equity may provide , including the costs, expenses and disbursements necessary to pursue this action, and reasonable attorney fees under D.C. Official Code Sec. 1-615.54 and 42 U.S.C. Sec. 1983.

## JURY DEMAND

Plaintiff demands a trail by jury for all issues so triable.

Respectfully Submitted:

_____/s/_____
F. Douglas Hartnett
Elitok and Hartnett at Law, L.L.C.
2428 Wisconsin Avenue, NW
Washington, DC  20007
(202) 965-0529 / (202) 965 0530 (fax)

Counsel for Plaintiff