## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THYRA LOWE,

      Plaintiff,

      v.

DISTRICT OF COLUMBIA, *et al.*,

      Defendants.

Civil Action No. 05-2205 (CKK)

## MEMORANDUM OPINION
(November 15, 2009)

Plaintiff Thyra Lowe brought this action alleging that she was unlawfully terminated by the District of Columbia Department of Health ("DOH") in retaliation for, among other things, speaking out about her supervisors' alleged misconduct and sex discrimination in the workplace. The case was removed to this Court from the Superior Court for the District of Columbia. Plaintiff's Second Amended Complaint alleges claims under the D.C. Whistleblower Protection Act, D.C. Code §§ 1-615.51 *et seq.*, the First Amendment (through 42 U.S.C. § 1983), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

Presently before the Court is Defendants' Motion for Summary Judgment. In Plaintiff's opposition to Defendants' motion, Plaintiff indicates that she no longer will pursue her First Amendment claim. Accordingly, the Court shall grant Defendant's motion with respect to Count II of the Second Amended Complaint. For the reasons explained below, the Court shall also grant Defendant's motion with respect to Plaintiff's Title VII claim for retaliation. The only remaining cause of action arises under state law, and the Court declines to exercise supplemental jurisdiction over that claim. Therefore, the Court shall remand the case to the Superior Court for the District of Columbia for further proceedings.

## I. BACKGROUND

From November 2002 until her termination in November 2004, Plaintiff Thyra Lowe was an employee in the District of Columbia Department of Health, Emergency Health and Medical Services Administration ("EHMSA").[1] Sec. Am. Compl. ¶ 7. In her position as Deputy Administrator, Lowe was responsible for administering federal grants awarded to EHMSA from various federal agencies, many of which related to bioterrorism. *Id.* ¶¶ 7, 14. Below is an overview of the facts pertinent to this lawsuit.

### A.      Lowe's Support of Her Supervisor, Sherry Adams

At the time she was hired, Lowe's primary supervisor was the Administrator of EHMSA, Sherry Adams. Sec. Am. Compl. ¶ 8. Lowe believed that Dr. Michael Richardson, who was then the DOH Senior Deputy Director for Medical Affairs, was unhappy with Ms. Adams' performance as administrator. Pl.'s Mem. Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Mem."), Ex. 1 (Sworn Decl. of Thyra Lowe) (hereinafter, "Lowe Decl."), ¶ 2.[2] However, Lowe forged a good working relationship with Adams and ultimately believed that Dr. Richardson was misguided in his views. *Id.* ¶ 3. On March 7, 2003, Richardson removed Adams from her position as EHMSA Administrator and demoted her to a new position unrelated to EHMSA. *See* Lowe Decl. ¶ 4; Pl.'s Mem., Ex. 2 (Dep. of Sherry Adams) at 9-10. Around March 10, 2003, Lowe wrote a memorandum to the then-Director of DOH, Dr. James Buford, explaining why she believed that

---

[1] This unit has since been renamed and is currently known as the Health Emergency Preparedness and Response Administration. *See* Pl.'s Mem., Ex. 2 (Dep. of Sherry Adams) at 150.

[2] Because Defendants did not submit a reply brief to rebut the evidence cited by Lowe in her opposition, the Court accepts the allegations in Lowe's declaration as true, to the extent they would be admissible at trial, unless controverted by other evidence in the record.

Adams should be reinstated.  Lowe Decl. ¶ 6.

After several weeks in her new position, Adams filed a lawsuit against DOH.  Pl.'s Mem., Ex. 2 (Dep. of Sherry Adams) at 10.  Adams claimed that she was unlawfully demoted in retaliation for complaining about improper conduct by Dr. Richardson.  *Id.* at 10-12.  This allegedly improper conduct included Richardson's decision to award a lucrative contract to former D.C. mayor Sharon Pratt Kelly.  *Id.* at 12-13; *see also* Complaint ¶¶ 2, 23, *Adams v. Richardson*, Civ. Action No. 03-1033 (JDB) (D.D.C. filed May 12, 2003).[3]  Adams also claimed that Richardson took these actions because she is a woman.  Complaint ¶ 24, *Adams v. Richardson*, Civ. Action No. 03-1033 (JDB) (D.D.C. filed May 12, 2003).  In May 2003, Lowe signed two declarations in support of Adams' lawsuit.  Lowe Decl. ¶ 17.  Her declarations stated, among other things, that she believed that Richardson had illegally awarded the contract to former mayor Sharon Pratt Kelly and that she believed Adams had been discriminated against because of her sex.  *Id.*

Shortly after Adams' demotion, Richardson hired Dr. Feesah Woldu to fill the position of Acting Administrator.  Lowe Decl. ¶ 5.  Lowe believed that Dr. Woldu was not capable of handling the duties of that job, and in fact Lowe was asked by Woldu to perform several tasks that were not in the official job description of Deputy Administrator.  *Id.* ¶ 15.  Sometime after Dr. Woldu was hired, Dr. Richardson hired Dr. Thomas Calhoun to serve as EHMSA's Medical Director.  *Id.* ¶ 21.  Lowe initially got along with Dr. Calhoun and confided in him concerning several of her concerns about EHMSA's use of federal grant funds.  *Id.*  In February 2004, after Dr. Woldu had left his position, the City Administrator appointed Dr. Calhoun as Acting

---

[3] The Court takes judicial notice of Sherry Adams' 2003 lawsuit and the pleadings filed therein.

Administrator.  *Id.* ¶ 22.  Around this same time, Mr. Buford was replaced by Herb Tillery as the

Interim Director of Health.  *Id.* ¶ 23.  Dr. Richardson left the Department of Health prior to March

2004.  *See* Def.'s Mem., Ex. 2 (Decl. of Cheryl Edwards) ¶¶ 2, 4.

Adams' lawsuit was settled on June 15, 2004.  *See* Stipulation and Order of Dismissal,

*Adams v. Richardson*, Civ. Action No. 03-1033 (JDB) (D.D.C. June 15, 2004).  As a result of the

settlement, Adams returned to EHMSA in July 2004 as the Assistant Senior Deputy

Administrator.  Lowe Decl. ¶ 31; Def.'s Mem., Ex. 5 (Def. Monica Lamboy's Resps. &

Objections to Pl.'s First Set of Interrogs.) (hereinafter, "Lamboy Interrogs.") at 4.

**B.     Lowe's Criticisms of DOH Management**

During her tenure at EHMSA, Lowe was a frequent critic of what she perceived to be

mismanagement and misconduct by officials at DOH.  Shortly after she arrived at DOH, and prior

to Sherry Adams' termination in March 2003, Lowe spoke out against Dr. Richardson's proposal

to award a $250,000 contract to former mayor Sharon Pratt Kelly, whom she felt was unqualified

to perform the contract.  Lowe Decl. ¶¶ 10-11.  Lowe communicated to Dr. Richardson her belief

that such a contract would violate the terms of the federal grants from which the contract would

be paid and that Richardson wanted to award the contract to further his political ambitions.  *Id.* ¶¶

12-13.  After speaking out, Lowe claims that Richardson treated her as an insubordinate

employee, retaliating against her because of her opposition to the contract and Sherry Adams'

demotion by appointing Dr. Woldu to fill the Acting Administrator position instead of promoting

her to that position.  *Id.* ¶ 14.

Around June 2003, Drs. Richardson and Woldu indicated that they planned to move

several DOH staff members onto the payroll funded by federal bioterrorism grants overseen by

Lowe.  *Id.* ¶ 18.  Lowe opposed this move because she believed that it would violate federal

restrictions on using bioterrorism grant funds to supplant state and local funding. *Id.* After

Richardson and Woldu went ahead with the plan, Lowe voiced her concerns to the officials at the

Centers for Disease Control and Prevention (CDC) who managed the grants at issue. *Id.* ¶ 20.

Shortly after Dr. Thomas Calhoun was appointed Acting Administrator for EHMSA in

February 2004, Calhoun began to harass Lowe by dressing her down in public. *Id.* ¶ 25. Lowe

also claims that Calhoun was hostile to her nearly every day he was Acting Administrator. *Id.*

¶ 26. Furthermore, Lowe claims that Calhoun began an effort to convince Herb Tillery, the

newly-appointed Interim Director of Health, that Lowe was a "problem for the agency because

[she] would not acquiesce in former and current managerial decisions to misuse grant monies."

Lowe Decl. ¶ 24. In March or April 2004, Calhoun called Lowe into her office and accused her of

lying on her resume. *Id.* ¶ 28.

Lowe claims that after Sherry Adams settled her lawsuit and returned to EHMSA, Dr.

Calhoun and Dr. Dan Lucey, Interim Chief Medical Officer at DOH, continued attempts to have

Lowe fired "because of [her] unwillingness to acquiesce in the agency's attempts to violate laws

and regulations governing disbursement of grant monies." Lowe Decl. ¶ 31. Lowe also claims

that they damaged her reputation with other senior managers at DOH, including Interim Director

of Health Tillery, Chief of Staff Cheryl Edwards, and Chief Operating Officer Monica Lamboy.

*Id.*

Throughout Lowe's tenure as Deputy Administrator, the District of Columbia Hospital

Association (DCHA) pressed DOH for a larger share of money from the federal grants managed

by Lowe. *Id.* ¶ 30. Lowe claims that many of the purposes for which the Association sought

funding were not approved by the granting agencies, and she communicated this fact to DOH and

EHMSA management. *Id.* Around late June 2004, DCHA lobbied to obtain $240,000 in grant

funds for salary of the DCHA Medical Director, Dr. Jeffrey Elting.  *Id.* ¶ 34.  Lowe consulted with

the federal granting agencies and determined that Dr. Elting's salary was not a permissible use of

federal grant funds.  *Id.* ¶ 35.  Lowe informed Drs. Calhoun and Dr. Lucey that they should not

agree to pay Dr. Elting's salary until they had received a ruling from the federal agencies on the

propriety of the spending.  *Id.* ¶ 36.  However, Drs. Calhoun and Lucey had promised DCHA

President Bob Malson that the position would be funded through a federal grant.  *Id.*  The dispute

came to a head in a June 30, 2004 meeting involving Lowe, Malson, Edwards, Tillery, Calhoun,

and Adams in which Lowe was scolded and accused of lying about the restrictions on the federal

grant funds, despite obtaining confirmation from the granting agencies.  *Id.* ¶¶ 37-38.

       After the June 30, 2004 meeting, DCHA, through a DOH-sponsored Bioterrorism

Committee, asserted veto power over DOH grant fund allocations, proposing to make more

money available for its own use.  Lowe Decl. ¶ 39.  Lowe contacted the federal granting agencies

to obtain decisions regarding DCHA's proposed uses of grant funds.  *Id.* ¶ 40.  Lowe obtained

rulings that indicated the proposed use of funds to pay part of Dr. Elting's salary was illegal.  *Id.*

On September 17, 2004, the Director of the D.C. Office of Boards and Commission determined

that the Bioterrorism Committee is purely advisory and does not have authority to review grant

submissions.  *Id.* ¶ 41.

       Lowe also claims that in September 2004, she sent Monica Lamboy several emails

protesting what Lowe perceived to be illegal staffing changes that were being proposed by

Lamboy.  Lowe Decl. ¶¶ 42-43.

**C.**     **EHMSA Restructuring and Lowe's Termination**

       In or about June or July 2004, DOH underwent a major restructuring and realignment.

Def.'s Stmt. of Material Facts As to Which There Is No Genuine Issue ("Def.'s Stmt.")[4] ¶ 13.

Some of the key individuals involved in the restructuring were DOH Chief of Staff Cheryl

Edwards, DOH Chief Operating Officer Monica Lamboy, DOH Interim Director Herb Tillery, and

DOH Director Gregg Pane.[5]  Cheryl Edwards became the DOH's Chief of Staff in March 2004.

Def.'s Stmt. ¶ 36.  Monica Lamboy became DOH Chief Operating Officer in April 2004.  Def.'s

Stmt. ¶ 48.  Dr. Gregg Pane was the Director of DOH from September 2004 to October 2007.  *Id.*

¶ 67.[6]

Monica Lamboy played a major role in the restructuring of DOH.  Def.'s Stmt. ¶ 48.

Throughout the summer of 2004, Lamboy worked with Tillery and Edwards to reorganize many

of the administrations within DOH, reducing the size of the larger administrations and creating the

position of Chief of Staff and Administrative Services Manager in each administration.  *Id.* ¶ 50;

Lamboy Interrogs. at 2-3.  Lamboy was responsible for reviewing the entire DOH budget, and she

was aware that Plaintiff Lowe was expressing concerns about delays in filling vacant positions

and that positions were being budgeted under the wrong grants.  Def.'s Stmt. ¶ 51.  As a result of

---

[4] The Court strictly adheres to the text of Local Civil Rule 7(h) (formerly Rule 56.1 when resolving motions for summary judgment).  *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (finding district courts must invoke the local rule before applying it to the case).  The Court has advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." [49] Order at 2 (Oct. 7, 2008).  Thus, in many instances the Court shall cite only to one party's Statement of Material Facts ("Stmt.") unless a statement is contradicted by the opposing party. The Court shall also cite directly to evidence in the record, where appropriate.

[5] In the Second Amended Complaint and elsewhere in the record, Defendant Pane's last is often misspelled as "Payne."

[6] Defendants filed a Supplemental Statement of Material Facts as to Which There Is No Genuine Issue with paragraphs numbered 65 through 73; the Court shall treat these supplemental paragraphs as part of the original filing.

Lamboy's efforts, over 200 positions were eliminated and the salaries of over 30 DOH positions, including some within EHMSA, were upgraded. *Id.* ¶ 53. Some of the positions abolished were Deputy Administrator positions. Def.'s Stmt. ¶ 56.

EHMSA was the last DOH administration to be reorganized. Def.'s Stmt. ¶ 20. During the summer of 2004, Lamboy, Tillery, and Edwards decided not to make organizational changes to EHMSA. Lamboy Interrogs. at 3. Lamboy claims that the reason for the delay was to spend more time understanding EHSMA's operating needs and the grant funding constraints. *Id.* However, Lowe claims the reason for the delay was that EHMSA was initially exempt from the department-wide restructuring plans due to its small size of about 30 employees. *See* Pl.'s Response/Rebuttal to Def.'s Stmt., ¶ 21. When Sherry Adams returned to EHMSA as Assistant Senior Deputy Director, EHMSA had a three-tiered management structure and only 32 overall employees. *Id.* at 3-4.

When Dr. Gregg Pane arrived in September 2004 as the new Director of Health for DOH, he was informed that DOH was undergoing a restructuring that began in March 2004 and that the last administration to be restructured was EHMSA. Def.'s Stmt. ¶¶ 67-68. Dr. Pane understood that the restructuring was being done because DOH was perceived as a troubled agency. *Id.* ¶ 69. Dr. Pane had discussions with Lamboy and Edwards about creating a Chief of Staff position within EHMSA to report to the director without having oversight of employees and to maintain the administrative officer, rather than upgrading to an Administrative Services Manager, because of the small size of EHMSA. Lamboy Interrogs. at 4. Lamboy determined that DOH should eliminate Lowe's position as Deputy Administrator and believed that this would result in a flatter organization that would more closely parallel the other reorganized administrations in the department. *Id.* at 4-5. Dr. Pane approved the abolition of Lowe's position because Lamboy told

8

him it was part of the overall reorganization plan and was consistent with how other administrations had been organized. Def.'s Stmt. ¶ 70-71. It is undisputed that Lowe's position was not abolished because of her performance. *Id.* ¶ 38.

The decision to eliminate Lowe's position was ultimately made by Dr. Pane based on Monica Lamboy's recommendation. Def.'s Stmt. ¶ 71; Pl.'s Mem., Ex. 5 (Def.'s Resps. & Objections to Pl.'s First Set of Interrogs.) at 2-3. Although Cheryl Edwards had no specific role in how EHMSA would be restructured, she did participate in discussions concerning the abolition of Lowe's position. Def.'s Stmt. ¶ 37; *see also* Pl.'s Mem., Ex. 4 (Dep. of Cheryl Edwards) at 17-18. Dr. Calhoun had no involvement in restructuring EHMSA. Def.'s Stmt. ¶ 27. As part of the restructuring, Dr. Calhoun was removed from his acting position as Senior Deputy Director and his permanent position as Medical Director and was moved to a vacant position within the Addiction Prevention and Recovery Administration. Lamboy Interrogs. at 5-6. The officials had determined that EHMSA no longer required a full-time medical director. *Id.* at 4.

On October 15, 2004, Director Pane met with Lowe and informed her that her position was being terminated, effective November 15, 2004. *See* Lowe Decl. ¶ 45; Def.'s Mem., Ex. 6 (Dep. of Thomas Calhoun) at 74-76. Pane also informed Calhoun that he was being transferred, and he told Sherry Adams that she would remain in the position of Senior Deputy Director for EHMSA. Def.'s Stmt. ¶ 28; Def.'s Mem., Ex. 6 (Dep. of Thomas Calhoun) at 74-78.

Lowe was not considered as a candidate to fill the new Chief of Staff position within EHMSA, which was paid at a higher grade. Lowe Decl. ¶¶ 51-52; Pl.'s Mem., Ex. 3 (Dep. of Monica Lamboy) at 23. Lowe claims that the Chief of Staff position was substantially similar to her position of Deputy Administrator, and at least one other Deputy Administrator was hired by DOH in a Chief of Staff position. Lowe Decl. ¶ 51. Lowe was the only EHMSA employee who

9

was taken off DOH payroll as a result of the restructuring; Dr. Calhoun was also affected but moved to another administration. Lowe Decl. ¶ 47. However, several Deputy Administrators in other administrations were terminated as a result of the overall restructuring plan. Lamboy Interrogs. at 8.

Lowe claims that the reorganization of EHMSA "was undertaken so that [DOH] could move me out of the [Bioterrorism] Coordinator position and they felt, control EHMSA[']s budget in any way they saw fit. Additionally, so that Dr. Elting could be hired as the Medical Director and DC DOH would pay his entire $240,000 salary from the DCHA." Lowe Decl. ¶ 46. Lowe has also alleged that the restructuring occurred in retaliation for Lowe's protesting Dr. Richardson's decision to remove Sherry Adams from her position in 2002, her protests regarding the contract awarded to former mayor Sharon Pratt Kelley, the declarations she submitted for Sherry Adams' lawsuit, her protests regarding the payment of DOH officials with federal grant funds, her protests within DOH regarding the plan pay Dr. Elting's salary with federal grant funds, her communications with federal granting agencies regarding alleged illegalities, and her protests regarding Lamboy's plans to restructure EHMSA. *See* Pl.'s Mem. at 15.

## II. LEGAL STANDARD

Summary judgment is proper when "the pleadings, the discovery [if any] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  All underlying facts and inferences are analyzed in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier of fact could find for the non-moving party.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment."  *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Conclusory assertions offered without any factual basis for support do not satisfy an opponent's burden to set forth "affirmative evidence" showing a genuine issue for trial.  *Broaddrick v. Exec. Office of the President*, 139 F. Supp. 2d 55, 65 (D.D.C. 2001) (citing *Laningham*, 813 F.2d at 1241).

11

## III.  DISCUSSION

Lowe has alleged claims under both the D.C. Whistleblower Protection Act (DCWPA) and Title VII, but the bulk of her allegations pertain to the DCWPA.  Because Title VII provides the basis for federal jurisdiction in this case, and because the analysis of the DCWPA is based on Title VII precedents, the Court shall examine Lowe's Title VII claim first.

### A.   Title VII Retaliation[7]

Lowe claims that Defendants abolished her position at EHMSA in retaliation for engaging in protected activity in violation of Title VII.[8]  Sec. Am. Compl. ¶ 72.  Under Title VII, it is unlawful for an employer to discriminate against an employee because she "has opposed any practice made an unlawful employment practice" by Title VII or because she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a).  Although Lowe does not explicitly differentiate between those activities she claims are protected under Title VII as opposed to under the D.C. Whistleblower

---

[7] Count III of the Second Amended Complaint purports to state a claim for "Discrimination and Retaliation in Violation of Title VII."  Sec. Am. Compl. at 20.  However, the allegations in the Second Amended Complaint do not describe any discrimination on the basis of any class protected by Title VII, such as race or sex.  *See id.* ¶¶ 70-73.  Nor does Plaintiff argue any such discrimination in her brief in opposition to Defendant's Motion for Summary Judgment.  *See* Pl.'s Mem. at 22-23.  Accordingly, the Court construes Plaintiff's Second Amended Complaint as stating a claim only for retaliation under Title VII, not discrimination.

[8] The Court notes that Plaintiff makes occasional references in the Second Amended Complaint and in her summary judgment briefing to actions by her employer, separate from her termination, that could be deemed retaliatory.  *See, e.g.*, Sec. Am. Compl. ¶ 34 (describing efforts to damage Plaintiff's reputation); *id.* ¶ 60 (stating that "Defendant discriminat[ed] and retaliat[ed] against Plaintiff, ending with her removal and failure to rehire her after the 'restructuring'").  However, Count III of the Second Amended Complaint focuses solely on the abolition of Plaintiff's position, not on any antecedent retaliation, *see* Sec. Am. Compl. ¶ 72, and it does not appear that Plaintiff exhausted any claims regarding pre-termination retaliation with the EEOC prior to filing this action, *see id.* ¶ 57.  Accordingly, the Court is limited to considering whether Plaintiff's termination itself was retaliatory.

Protection Act, the declarations she submitted in Sherry Adams' discrimination lawsuit clearly qualify as protected activity under Title VII.  Defendants do not dispute that Lowe engaged in Title VII-protected activity but contend that Lowe cannot establish a prima facie case of retaliation because too much time elapsed between the protected activity and her termination.  *See* Def.'s Mem. at 18.  Defendants also contend that Lowe was terminated for a legitimate reason unrelated to her Title VII-protected activity: department-wide restructuring and reorganization. *See* Def.'s Mem. at 3-5.

Retaliation claims based on circumstantial evidence, like Lowe's, trigger the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  "Under that framework, a plaintiff must first establish a prima face case of retaliation by showing (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two.  *Id.* (citing *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)).  "If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions."  *Id.* (internal quotation marks omitted).  However, the D.C. Circuit has stressed that once an employer has proffered a nondiscriminatory reason, the *McDonnell Douglas* burden-shifting framework disappears, and the court must simply determine whether the plaintiff has put forward enough evidence to defeat the proffer and support a finding of retaliation.  *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007); *see also Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) ("[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.")  In reviewing a motion for summary

13

judgment, the court "looks to whether a reasonable jury could infer . . . retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation." *Jones v. Bernanke*, 557 F.3d at 677 (internal quotation marks omitted).

The plaintiff bears the burden of persuasion to show that a defendant's proffered non-retaliatory reason for the challenged action is a pretext. *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 654 (D.C. Cir. 2003). A plaintiff can carry this burden by either showing that the proffered reason is false, *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008), or "by presenting enough evidence to allow a reasonable trier of fact to conclude that 'the employer's proffered explanation is unworthy of credence.'" *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). "If the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady v. Office of the Sergeant at Arms*, 520 F.3d at 495. "In exceptional circumstances, the evidence supporting a plaintiff's prima facie case may, on its own, suffice to defeat the proffer's presumption of validity and thus render summary judgment improper." *Woodruff v. Peters*, 482 F.3d at 530.

With these principles in mind, the Court shall review each party's evidence in support of its position.

### 1.      Plaintiff's Case for Retaliation

Lowe engaged in Title VII-protected activity in May 2003 when she submitted two declarations in support of her former supervisor Sherry Adams' lawsuit, which included allegations of sex discrimination. Lowe does not have any direct evidence to connect her

protected activity to her termination.  However, she may rely on circumstantial evidence to prove

that her termination was motivated by retaliatory animus.  The causal connection between a

plaintiff's protected activity and her adverse employment action may be established by showing

that her employer had knowledge of her protected activity and that the adverse employment action

took place shortly after that activity.  *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985).

Where a plaintiff suffers retaliation for participation in a lawsuit, the Court must look not only to

when the participation occurred, but when the animosities created by that lawsuit would have

ended.  *See Globus v. Skinner*, 721 F. Supp. 2d 329, 335 (D.D.C. 1989).

Here, the evidence supports a finding that at least one of the individuals who helped make

the decision to terminate Lowe's position had knowledge of Lowe's protected activity.  The

record indicates that the decision to eliminate Lowe's position was made by Dr. Gregg Pane based

on Monica Lamboy's recommendation in consultation with Cheryl Edwards.  *See* Lamboy

Interrogs. at 9.  Lowe does not dispute that neither Pane nor Edwards had any knowledge of

Lowe's involvement in the Sherry Adams litigation.  *See* Def.'s Stmt. ¶¶ 45, 63; Pl.'s

Resp./Rebuttal to Def.'s Stmt. ¶¶ 45, 63.  However, there is some disputed evidence in the record

to indicate that Monica Lamboy may have been aware of Lowe's protected activity.  In the District

of Columbia's answers to Plaintiff's first set of interrogatories, it stated that DOH officials and

District [of Columbia] attorneys discussed Thyra Lowe's participation in support of Sherry

Adams' Complaint against DOH with several individuals, including Herbert Tillery, Cheryl

Edwards, and Monica Lamboy.  *See* Pl.'s Mem., Ex. 5 (Def.'s Resps. & Objections to Pl.'s First

Set of Interrogs.) at 8.  Those discussions took place prior to June or July 2004 when Sherry

Adams settled her lawsuit and returned to EHMSA, and the discussions analyzed Lowe's written

statements in support of Ms. Adams.  *Id.*  Although Lamboy states in her declaration that she has

15

neither "seen" nor "read" the declarations submitted by Lowe in the Adams lawsuit, *see* Def.'s Ex.

4 (Decl. of Monica Lamboy) ¶ 6, she indicates in her interrogatory responses that she knew Lowe

was supportive of Adams in general, although she did not recall if she knew about the statements.

Lamboy Interrogs. at 6.  Although this is fairly thin evidence of Lamboy's knowledge, the Court

must construe the facts in the light most favorable to Lowe and permit an inference that Lamboy

was aware of Lowe's protected activity.

However, knowledge alone does not permit an inference that Lowe's termination was

retaliatory—there must be temporal proximity as well.  The evidence indicates that Lamboy

would have learned of Lowe's protected activity by at least June 15, 2004, when Adams' lawsuit

was settled.  Lowe was terminated four months later, on October 15, 2004.  "The cases that accept

mere temporal proximity between an employer's knowledge of protected activity and an adverse

employment action as sufficient evidence of causality . . . uniformly hold that the temporal

proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

In *Breeden*, the Supreme Court cited with approval two cases involving periods of time equal to

or shorter than the four-month period present here.  *See id.* (citing *Richmond v. ONEOK, Inc.*, 120

F.3d 205, 209 (10th Cir. 1997) (holding that a three-month period between protected activity and

termination could not support inference of causation) and *Hughes v. Derwinski*, 967 F.2d 1168,

1174 (7th Cir. 1992) (4-month period); *see also Woods v. Bentsen*, 889 F. Supp. 179, 187 (E.D.

Pa. 1995) ("[C]ourts generally hold that if at least four months pass after the protected action

without employer reprisal, no inference of causation is created.").  Another court in this District

noted prior to *Breeden* that "[a]lthough courts have not established the maximum time lapse

between protected Title VII activity and alleged retaliatory actions for establishing a causal

connection, courts generally have accepted time periods of a few days up to a few months and

16

seldom have accepted time lapses outside of a year in length." *Brodetski v. Duffey*, 141 F. Supp.

2d 35, 43 (D.D.C. 2001).  Several courts within this Circuit have viewed *Breeden* as establishing

three months as the outer limit for supporting a causal inference of discrimination.  *See, e.g.*,

*Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (citing *Breeden* and noting its approval of

three-month period as insufficient as a matter of law); *Beckford v. Geithner*, Civ. Action No. 06-

1342, 2009 WL 3297495, at *10 (D.D.C. Oct. 15, 2009) (same); *Lewis v. District of Columbia*,

Civ. Action No. 07-429, 2009 WL 2920878, at *9 (D.D.C. Sept. 14, 2009) (same); *Johnson v.*

*Washington Metro. Area Transit Auth.*, 355 F. Supp. 2d 304, 307-08 (D.D.C. 2005) (same);

*Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118-19 (D.D.C. 2004) (holding that two days less

than three months "clearly pushes the temporal requirement in a retaliation case to its outer

limit").  One court has even held that two months is too long to support an inference of

discrimination.  *See Baker v. Potter*, 294 F. Supp. 2d 33, 41 (D.D.C. 2003).  As Judge John D.

Bates has said, however, "there is no hard-and-fast rule that any specified amount of time is too

removed for an inference of causation." *Pardo-Kronemann v. Jackson*, 541 F. Supp. 2d 210, 218

(D.D.C. 2008).

    This Court has found only one case within this Circuit where the court allowed a causal

inference of discrimination for a period of time similar to the four months at issue here.  In *Castle*

*v. Bentsen*, 867 F. Supp. 1 (D.D.C. 1994), the evidence at trial indicated that plaintiff had filed a

discrimination complaint sometime around the Spring of 1991 and that some activity with respect

to that complaint was taken "in the fall," and she was terminated in January. *Id.*  The Court

denied the Defendant's motion for judgment as a matter of law on the retaliation claim, reasoning

that the time period of "three to five months" between the activity and termination establishes a

causal connection and prima facie case sufficient to go to the jury. *Id.* at 3.  Although the holding

in *Castle* would seem to apply to the facts here, at least with respect to the Plaintiff's ability to make out a *prima facie* case of retaliation, there are several reasons to discount the holding in *Castle*. First, that decision was issued prior to the Supreme Court's decision in *Breeden*, which admonished that time periods must be "very close" and cited three- and four-month periods with disapproval. Second, the *Castle* court relied on *Mitchell v. Baldrige*, 759 F.2d 80 (D.C. Cir. 1985), for the proposition that a three-month period was sufficient to establish a causal connection. *See* 867 F. Supp. at 3. However, a closer reading of *Mitchell* reveals that the plaintiff there had evidence of a pattern of protected activity followed by suspiciously poor performance evaluations, and he received a notice of unsatisfactory performance just one month after he filed an EEO complaint, with his suspension following two months later. 759 F.2d at 86-87. In light of these facts, the Court is not persuaded by *Castle*'s extension of *Mitchell*.[9]

Although four months is at the shorter end of the spectrum of cases in which courts have rejected an inference of causation based on temporal proximity, there are other factors present in this case that weaken the causal link between Plaintiff's protected activity and her termination. First, her protected activity actually occurred in May 2003, a year prior to the time that any of the DOH officials ultimately responsible for terminating her learned of her involvement in the Adams litigation. Second, the individual about whom Plaintiff was complaining—Dr. Richardson—had already left the agency by the time those officials learned of Plaintiff's protected activity. *But see Beard v. Preston*, 576 F. Supp. 2d 93, (D.D.C. 2008) (noting that a change in management does

---

[9] The procedural posture of *Castle*—which involved a motion for judgment as a matter of law at the close the plaintiff's evidence at trial—provides another reason for hesitating before relying on its three-to-five month ruling, as it appears that many of the key facts established at trial regarding the retaliation claim are omitted from the court's somewhat abbreviated opinion. *See* 867 F. Supp. at 3.

not necessarily destroy a causal link between protected activity and retaliatory treatment).  Third, around this same time in the early summer of 2004, the Adams litigation reached a settlement in which Adams returned to her position at EHMSA, suggesting that any hostilities pertaining to Plaintiff's protected activity had ameliorated by this time.

Of course, establishing a close temporal connection is not the only way to prove causation. "A plaintiff may also put forward direct evidence and disregard the presumption and its time limitations." *Vance v. Chao*, 496 F. Supp. 2d 182, 186 (D.D.C. 2007).  However, Lowe has not identified any direct evidence that her termination was retaliatory for her Title VII-protected activity.  The only connection supported by the record between Plaintiff's protected activity and her termination is the fact that at least one of the officials who influenced the decision to remove her may have had knowledge of her protected activity approximately four months prior to her termination.

Plaintiff attempts to bolster the connection between her protected activity and her termination by pointing to an alleged pattern of retaliatory animus in the "intervening period" by Dr. Calhoun, who she claims continued Dr. Richardson's pattern of harassment against her because Calhoun had known Richardson for years.  *See* Pl.'s Mem. at 22.  However, this evidence is largely irrelevant to Lowe's Title VII claim.  Lowe does not dispute that Calhoun had no involvement in the restructuring of EHMSA.  *See* Def.'s Stmt. ¶ 27; Pl.'s Resp./Rebuttal to Def.'s Stmt. ¶ 27.  Moreover, Lowe does not articulate how any of the acts allegedly taken by Calhoun are connected to her *Title VII-protected activity*.  There is no indication that Calhoun's activites were temporally connected to Lowe's participation in the Adams lawsuit.  Moreover, to the extent Calhoun took any retaliatory actions against Lowe, the evidence suggests that they were triggered by the manner in which Lowe was doing her job managing federal grants for EHMSA, not by her

participation in the Adams litigation.  While such retaliation might be actionable under the D.C.

Whistleblower Protection Act, it is not actionable under Title VII.

Based on this evidence, Lowe has barely, if at all, established a prima facie case of

retaliation under Title VII.  Because Defendants have put forth evidence of a nondiscriminatory

reason for Lowe's termination, however, the Court must focus on the ultimate issue of retaliation

*vel non*.  *Jones v. Bernanke*, 557 F.3d at 678.

## 2.      Defendants' Asserted Nondiscriminatory Reason for Lowe's Termination

The Defendants have put forth evidence in the record, described above, that Lowe's

position was abolished as part of a DOH-wide restructuring and not due in any part to Lowe's

engagement in protected activity.  DOH officials began the overall restructuring efforts in early

summer 2004, and the reorganization reduced the size of many of the larger administrations

within DOH, eliminating over 200 positions and creating a Chief of Staff and Administrative

Services Manager in each administration to streamline operations.  EHMSA was similarly

restructured, with some modifications to account for the smaller size of the administration.

Defendants assert that Lowe's position was incompatible with the new EHMSA structure and

therefore was eliminated.

Lowe disputes Defendants' rationale.  She claims, for example, that the new Chief of Staff

position—paid at a higher grade than her Deputy Administrator position—is actually a watered

down version of the job she had been performing at EHMSA.  *See* Pl.'s Resp./Rebuttal to Def.'s

Stmt. ¶ 54.  Lowe also points to the fact that she was the only EHMSA employee who actually

lost her job as a result of the restructuring.  While there is some evidence in the record to support

these contentions, they do not provide much support to her claim that the restructuring was

pretextual.  The undisputed evidence shows that although Lowe was the only person fired from

EHMSA, an admittedly small administration within DOH, other Deputy Administrators within DOH did lose their jobs as a result of the restructuring. Def.'s Stmt. ¶ 56; Pl.'s Resp./Rebuttal to Def.'s Stmt. ¶ 56.[10] Thus, the fact that only Lowe was terminated within EHMSA is of little relevance to whether the elimination of Deputy Administrator-type positions was a legitimate part of the department-wide restructuring plan. Furthermore, Lowe's complaint regarding the Chief of Staff position is essentially that she was not hired for it. She does not dispute that Chief of Staff positions were created in each of the restructured administrations at DOH. "If the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495. Here, the Defendants' explanation is supported by the evidence in the record, and Lowe has not produced evidence sufficient to rebut that explanation.[11]

"Employees often try to cast doubt on an employer's asserted reason . . . [by] pointing to: changes and inconsistencies in the stated reasons for the adverse action; the employer's failure to follow established procedures or criteria; . . . or discriminatory statements by the decisionmaker." *Brady*, 520 F.3d at 495 n.3. Lowe has not done any of this, nor has she indicated that she was

---

[10] Lowe does not actually dispute that other Deputy Administrators lost their positions but argues that this fact is meaningless because she contends—without citing to any evidence in the record—that a few other Deputy Administrators did not lose their jobs as a result of the restructuring. *See* Pl.'s Resp./Rebuttal to Def.'s Stmt. ¶ 56.

[11] It should be noted that even if Lowe could show that the Defendants' explanation for her termination is false, she would still have to demonstrate that it was motivated by her Title-VII protected activity and not some other reasons, such as her complaints about grant funding. *See Brady*, 520 F.3d at 496 n.4 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 514 (1993)). The Court notes that nearly all of the evidence on which Lowe relies focuses on her whistleblower activity rather than her support of Sherry Adams' discrimination lawsuit.

treated differently than other similarly situated individuals.[12]  Thus, Lowe has not met her burden

to produce evidence sufficient for a reasonable to jury to find that Defendants' proffered

explanation is "unworthy of credence."  *See Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009)

(citing *Burdine*, 450 U.S. at 256).  This is not an "exceptional circumstance" in which "the

evidence supporting a plaintiff's prima facie case . . . on its own[] suffice[s] to defeat the proffer's

presumption of validity and thus render summary judgment improper."  *Woodruff v. Peters*, 482

F.3d at 530.  As discussed above, Lowe's circumstantial evidence of causation is meager, at best.

Thus, taken together with her scant evidence of pretext, the Court finds that Plaintiff has not

identified sufficient admissible evidence in the record to permit a reasonable jury to infer that her

termination occurred in retaliation for her Title VII-protected activity.  Accordingly, the Court

shall grant Defendants' motion for summary judgment as to Lowe's Title VII claim.

**B.     Plaintiff's Whistleblower Protection Act Claim**

This lawsuit was removed to this Court from the Superior Court of the District of

Columbia.  Because no federal claims remain after the grant of summary judgment to Defendants

on the Title VII claim, the Court has discretion to either dismiss the case, remand it to Superior

Court, or exercise supplemental jurisdiction over the remaining state-law claim.  *See* 28 U.S.C. §

1367(c)(3).  As other courts within this District have pointed out, "in the interests of comity,

federal judges should refrain from deciding cases founded solely on local law when the

requirements for diversity jurisdiction are not present."  *Mitchell v. Yates*, 402 F. Supp. 2d 222,

235 (D.D.C. 2006); *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 97 (D.D.C. 2006).

---

[12] Plaintiff's unsubstantiated assertion that one other Deputy Administrator within the entire Department of Health was promoted to the position of Chief of Staff, *see* Pl.'s Resp./Rebuttal to Def.'s Stmt. ¶ 56, is not sufficient to show that Lowe was treated differently than similarly situated individuals.

This is especially true where the remaining claim raises novel issues of state law. *See* 28 U.S.C.

§ 1367(c)(1). As Defendant noted in its brief supporting summary judgment, "[t]he law in the

District of Columbia relative to the WPA is in its infant stages of development." Def.'s Mem. at

11. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of

factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience,

fairness, and comity—will point toward declining to exercise jurisdiction over the remaining

state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also*

*Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005) (citing *Cohill*). "[T]hese factors

usually will favor a decision to relinquish jurisdiction when 'state issues substantially

predominate, whether in terms of proof, of the scope of the issues raised, or of the

comprehensiveness of the remedy sought.'" *Id.* (quoting *United Mine Workers of Am. v. Gibbs*,

383 U.S. 715, 726 (1966). Accordingly, the Court declines to exercise supplemental jurisdiction

over Plaintiff's Whistleblower Protection Act claim and shall remand the case to the Superior

Court for the District of Columbia for further consideration.

## IV.  CONCLUSION

Because Plaintiff has not opposed Defendants' motion with respect to her claim under 42

U.S.C. § 1983, the Court shall GRANT Defendant's Motion for Summary Judgment with respect

to Count II of the Second Amended Complaint. For the foregoing reasons, the Court shall also

GRANT Defendant's Motion for Summary Judgment with respect to the Title VII claims asserted

in Count III of the Second Amended Complaint. Plaintiff initially filed this action in the Superior

Court for the District of Columbia, and after Defendants removed the case to this Court, Plaintiff

added one federal claim. Now that all of the federal claims have been addressed by this Court,

Plaintiff's only remaining claim is based on a state law that is still being addressed in the first

instance by the District of Columbia courts.  Accordingly, the Court shall REMAND this case to

the Plaintiff's original choice of forum, the Superior Court for the District of Columbia, for

further proceedings.  An appropriate order accompanies this Memorandum Opinion.


Date: November 15, 2009

                                        _____/s/_____
                                        **COLLEEN KOLLAR-KOTELLY**
                                        United States District Judge